UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| RICHARD M. RYBOLT, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | 1:10-cv-581-SEB-TAB |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**Entry Discussing Complaint for Judicial Review**

Richard M. Rybolt ("Rybolt") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), 42 U.S.C. ' 301, *et seq*.

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

**I.   Background**

Rybolt applied for DIB and SSI on June 1, 2006, alleging an onset date of February 2, 2006. His applications were denied initially and upon reconsideration. His request for a hearing before an Administrative Law Judge ("ALJ") was granted, and a video hearing was conducted on March 12, 2009. Medical and other records were introduced into evidence. Rybolt was present, accompanied by his attorney. Rybolt, his mother, and a vocational expert testified. The ALJ denied Rybolt's applications on April 20, 2009. On March 11, 2010, the Appeals Council denied Rybolt's request for review, making the ALJ's decision final. *See Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. ' 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

The ALJ's decision included the following findings: (1) Rybolt met the insured status requirements of the Act through June 30, 2008; (2) Rybolt had not engaged in substantial gainful activity since February 2, 2006, the alleged onset date; (3) Rybolt had severe impairments consisting of restrictive lung disease, residuals from surgical repair of pectus excavatum, borderline intellectual functioning, and mild depression; (4) Rybolt did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Rybolt had the residual functional capacity ("RFC") to perform a reduced range of light work as defined in 20 C.F.R. ' ' 404.1567(b) and 416.967(b) and Rybolt could do the following: occasionally climb stairs; lift 20 pounds occasionally; stand or sit for a total of 6 hours in an 8 hour day, but could only walk brief periods (no more than one block at a time); must avoid even moderate exposure to pulmonary irritants; and was limited to performing simple, repetitive tasks; (6) Rybolt was unable to perform any past relevant work; (7) Rybolt was born on July 13, 1978, and was 27 years old, which is defined as a younger individual, on the alleged disability onset date; (8) Rybolt had a limited education and was able to communicate in English; (9) transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Rybolt is "not disabled" whether or not he had transferable job skills; and (10) considering Rybolt's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Rybolt could perform. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Rybolt had not been under a "disability" as defined in the Act, from February 2, 2006, through the date of the ALJ's decision.

## II.  Discussion

### A.  Applicable Law

To be eligible for DIB and SSI, a claimant must prove he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. ' ' 423(d)(1)(A); 1382c(a)(3)(A). To establish disability, the plaintiff is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. ' ' 416.908; 404.1508.

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or   combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4)

> the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. ' ' 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five.

*Id*. The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.* at 352.

The task a court faces in a case such as this is not to make a *de novo* determination of the plaintiff=s entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B. Analysis

In this case, the ALJ concluded that although Rybolt had severe impairments consisting of restrictive lung disease, residuals from surgical repair of pectus excavatum, borderline intellectual functioning, and mild depression, he could perform a reduced range of light work. More specifically, the ALJ concluded that Rybolt could occasionally climb stairs, lift 20 pounds occasionally, stand or sit for a total of 6 hours in an 8 hour day but only walk brief periods (no more than one block at a time), must avoid even moderate exposure to pulmonary irritants, and was limited to performing simple, repetitive tasks.

Rybolt argues that the ALJ=s decision is not supported by substantial evidence. More specifically, he contends that the ALJ improperly Aplayed doctor@ by making lay judgments of medical data without a medical expert. Rybolt also argues that the ALJ erred by ignoring evidence that was favorable to his claim, including evidence of the severity of his condition and its deteriorating nature and evidence of how fatigue would effect any employment.

Rybolt focuses on the two most recent medical reports. On November 14, 2007, a pulmonary function test interpretation indicated the following:

> **SPIROMETRY:** . . . The FEV and FVC are severely reduced in a pattern consistent with restrictive ventilatory abnormality. Suggest measurement of static lung volumes.
>
> **DIFFUSING CAPACITY:** Moderately reduced diffusing capacity. The reduction in DLCO may be partially explained by the reduced lung volumes as measured by single breath VA determination.

* * *

> **CONCLUSIONS:** This study is most consistent with severe restrictive defect. The decreased diffusing capacity may reflect loss of pulmonary capillary surface area. Causes include pulmonary fibrosis, pulmonary vascular disease, emphysema, CHF, pneumonitis, or decreased alveolar ventilation.

(R. at 307).

On December 1, 2008, a PFT [Pulmonary Function Test] and ABG [Arterial Blood Gas] Interpretation indicated:

> **SPIROMETRY:** The FEV-1 and FVC are severely reduced in a pattern consistent with a restrictive ventilatory abnormality. Suggest measurement of static lung volumes and DLCO.
>
> **STATIC LUNG VOLUMES:** There is severe restrictive defect.
>
> **DIFFUSING CAPACITY:** Moderately reduced diffusing capacity. Note that the value for diffusing capacity is not corrected for hemoglobin, and that anemia may decrease while polycythemia may increase the reported value. The reduction in DLCO may be partially explained by the reduced lung volumes as measure by single breath VA determination.
>
> **PRIOR TEST RESULTS:** Compared to the previous test on 10/29/07, the FVC decreased by 420 ml. This change is significant. Compared to the previous test on 10/29/07, the FEV-1 decreased by 280 ml. This change is significant.
>
> **CONCLUSION:** This study is most consistent with severe restrictive defect from possible mixed parenchymal-neuromuscular process.

(R. at 299).

The ALJ mentioned these test results as follows:

> Pulmonary function tests, dated November 14, 2007, and December 1, 2008, revealed that the claimant had severe restrictive defect (Exhibit B15F page 9). However, in both tests, the claimant=s diffusing capacity is described as only moderately reduced (Exhibit B15F pages 1 and 9).

(R. at 14).

Rybolt asserts that the ALJ failed to consider and explain the significance of the pulmonary function test results. The Commissioner characterizes the ALJ's two sentence reference to the reports as an "explicit discussion of these pulmonary function tests." Rybolt contends that the bare mention of two medical reports, each of which contained complex medical data, was insufficient. Rybolt argues that the ALJ did not adequately consider the fact that the evidence in 2006 described his pulmonary restriction as "moderately severe," and then beginning with the 2007 and then the 2008 tests, the restrictive defect was listed as "severe."[1] Further, the ALJ did not explain the meaning of "moderately reduced diffusing capacity" in the context of having a "severe restrictive defect." This is true especially in light of the notation that the December 2008 changes were "significant." (R. at 299).

The Commissioner points out that treating physician Dr. Kher's notes on November 14, 2007, indicate, in part, "SOB - restrictive lung d[isease] - unchanged." (R. at 304). This is true, and *if* there were comparable notations after the 2008 results, and *if* Dr. Kher had not also opined that Rybolt was unable to work due to his limited ability to exert (R. at 14), the court could perhaps find that this error was harmless. The court, however, cannot overlook these circumstances.

The ALJ did not even acknowledge the fact that the December 2008 pulmonary tests reflected "significant" decreases in the FEV-1 and FVC numbers. (R. at 299).[2] Lacking a medical source providing some input as to the significance of the November 2007 and December 2008 findings, combined with the ALJ's unexplained remark that Rybolt's diffusing capacity was "only moderately reduced," (R. at 14), the court cannot ascertain whether the ALJ's decision that Rybolt was not disabled, at least as of October 29, 2007, when the 2007 tests were conducted, (R. at 310), is supported by substantial evidence. It is well settled that an ALJ may not "play doctor" and reach her own independent medical conclusions. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

---

[1] There were no significant changes between the pulmonary function tests conducted in 2004 and 2006. (R. at 309). The 2007 report indicated that "no prior test results are available for comparison." (R. at 307).

[2] The court is aware that Rybolt's last date insured was June 30, 2008, but in light of the two reasons for remand discussed in this Entry, it is possible that a determination of eligibility could be made on or prior to that date.

Under these circumstances, the court cannot be confident that the ALJ considered the important evidence of record, nor can it trace the path of the ALJ=s reasoning as it relates to the severity and deteriorating nature of Rybolt=s pulmonary condition. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that [she] considered the important evidence and . . . to enable us to trace the path of [her] reasoning.") (internal quotation omitted). The court requires that Aan ALJ build an accurate and logical bridge from the evidence to [her] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review.@ *Id.* (internal quotation omitted).

Rybolt next argues that the ALJ failed to grapple with the evidence relating to his severe fatigue. Rybolt testified that he had difficulty breathing, even when he sits and watches television. (R. at 25). He testified that if he walks a half a block he has to sit down and take a break for a minute before he can continue walking. *Id.* He testified that he tired easily and that he had to lie down twice a day for about an hour or two. (R. at 26). Rybolt=s mother, with whom Rybolt lives, testified that she sees Rybolt Atire very easily.@ (R. at 29). She testified that for a period of three years when she was the supervisor of a work crew, her boss gave Rybolt a chance to work with her. (R. at 28). She was able to accommodate Rybolt=s needs in that setting by letting him rest periodically and doing his job for him. *Id.*

The issue of fatigue is pivotal because although in assessing Rybolt=s RFC the ALJ did properly take into account a number of Rybolt=s limitations, the vocational expert testified that if an individual needed to lie down periodically during the course of the day, Ait would preclude all types of competitive work.@ (R. at 32).

The ALJ did not explain the weight she gave to the allegations of fatigue. She concluded the following as to the issue of credibility:

> After careful consideration of the evidence, the undersigned finds that the claimant=s medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant=s and his mother=s statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 13).

The Seventh Circuit has recently discussed in more than one decision its view of Aboilerplate@ credibility assessment language used by ALJs. *See Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir. 2011)*; Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

>The administrative law judge's opinion states that >after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.= This is a piece of boilerplate that appears in virtually identical language in both these cases as well as in a third social security disability case argued to us the same day. It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness's testimony is >not entirely credible= yields no clue to what weight the trier of fact gave the testimony.

*Parker,* 597 F.3d at 922.

The court finds no significant difference between an ALJ concluding that a claimant=s statements are Anot entirely credible@ and an ALJ concluding that a claimant=s statements Aare not credible to the extent they are inconsistent with the above residual functional capacity assessment@ when, in either case, there is no discussion of the weight given to the pertinent statements. The ALJ has pointed to no evidence suggesting Rybolt or his mother exaggerated the amount of fatigue he experienced or suggesting that he is a malingerer. *See Martinez*, 630 F.3d at 696 (AThere is no explanation of which of Martinez=s statements are not entirely credible or how credible or noncredible any of them are.@).

The Commissioner argues that treatment notes of Rybolt=s physicians did not reflect that he ever complained of having to lie down throughout the day due to fatigue. The Commissioner asserts that Rybolt=s complaints of having to lie down had no support from the medical evidence of record. The problem with this rationale is two-fold. First, the ALJ did not discuss how she weighed Rybolt=s allegations of fatigue, so the Commissioner=s *post hoc* defense is not persuasive. *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010)(A[t]he government's lawyers who defend denials of disability benefits often rely heavily on evidence not (so far as appears) relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of harmless error.@). Second, Rybolt *did* report and the medical records *do* reflect persistent shortness of breath at rest and with exertion and his having to stop activities to catch his breath. *See e.g.,* (R. 255-57 (Ahad to sit down to catch his breath frequently,@ Atakes several breaks because he gets short of breath@ when vacuuming), 263 (Apersistent dyspnea@), 264 (Acontinues to complain of SOB, both at rest and with exercise 1 to 2 blocks@), 267 (Adyspnea active@), 271 (Afatigue, active@), 275-77 (reported fatigue and shortness of breath), 304 (ASOB, fatigue active@), 309 (Adyspnea on exertion upon walking one block and upon ascending one flight of stairs@).  The ALJ restricted Rybolt to only walking one block at a time, but she did not address his testimony that with tasks as simple as sitting or vacuuming, he could not complete them without stopping to rest due to shortness of breath and fatigue.

Indeed, whether or not Rybolt had to lie down while at work is too narrow a question. The proper question is how Rybolt's fatigue would effect his ability to perform work on a regular and continuing basis, meaning eight hours a day, five days a week. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). Whether Rybolt would have to simply stop working to rest or catch his breath or whether he would have to lie down, neither question was addressed by the ALJ in evaluating Rybolt's credibility.

### III.   Conclusion

For the reasons set forth above, the ALJ's conclusion that Rybolt could perform a significant number of light jobs on a regular and continuing basis is not supported by substantial evidence. The court, therefore, is required to **remand** the case to the ALJ for further consideration. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand). Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:  09/15/2011

*[signature]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana